IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES WILKE, KRYSTIAN M. )
WNEK, PRZEMYSLAW WNEK, )
FRANCIS RONETTO and )
JEFF SCHIERA, )
 )
　　　　　Plaintiffs, )
 )
　　vs. ) No. 03 C 6991
 )
JOSEPH SALAMONE, WILLIAM )
WILDLY and SALAMONE BUILDERS, )
INC., an Illinois corporation, )
 )
　　　　　Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Charles Wilke, Krystian Wnek, Przemyslaw Wnek, Francis Ronetto and Jeff Schiera brought this action against defendants Joseph Salamone, William Whiteley[1] and Salamone Builders, Inc. (SBI), pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/1 *et seq.*, and Illinois common law. Plaintiffs filed suit after they were terminated from their carpentry jobs with SBI. In their complaint, plaintiffs allege that their termination served as retaliation for engaging in FLSA protected activity, and that it violated both the Illinois Minimum Wage Law and common law. Defendants now move for summary judgment. Plaintiffs have filed a motion to strike certain portions of defendants' Statement of Material Facts submitted in support of their summary judgment motion. For the following reasons, plaintiffs' motion to strike is denied and defendants' motion for summary judgment is granted in part and denied in part.

---

[1] William Whiteley is incorrectly referred to as William Wildly in the complaint and many of the documents subsequently filed with the court.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 Statements of Material Facts. SBI, a construction company headquartered in Illinois, does carpentry work for commercial and residential developments throughout the Chicago metropolitan area. Joseph Salamone is SBI's owner and president. Plaintiffs are carpenters who worked for SBI. In September 2003, SBI had a subcontract with Lincoln Properties, a general contractor, for the carpentry framing on a multi-unit apartment building known as Highlands of Lombard. Approximately sixty SBI employees, including the five plaintiffs, worked at the Highlands site. William Whiteley was SBI's superintendent on the project.

Whiteley contends that on September 4, 2003, Anthony Hager, the general superintendent for Lincoln Properties, complained about the craftsmanship on the soffits in a unit of the Highlands project. After examining the soffits, Whiteley agreed that they displayed "terrible workmanship" (Whiteley Dep. 38). The next day, a Friday, he met with the plaintiffs and another SBI carpenter, Michael Muscia, all of whom he believed to have worked on the relevant soffits. Whiteley expressed his dissatisfaction with the work and demanded that it be fixed by Monday. While Whiteley's exact words are in dispute, the parties agree that he told the carpenters that they had to fix the soffits on their "own time" (Rovetto Dep. 42, Wilke Dep. 46, Schiera Dep. 53, K. Wnek Dep. 42, P. Wnek Dep. 36). In his deposition, Muscia contends that Whiteley expressed anger about paying plaintiffs twice to do the work properly (Muscia Dep. 92). However, Charles Wilke testified that Whiteley stated that he was not going to pay twice for the work on the soffits (Wilke Dep. 55). All the plaintiffs testified that Whiteley also stated that if they did not fix the soffits on their own time he was going to terminate them (Rovetto Dep. 44, Wilke Dep. 51, Schiera Dep. 53, K. Wnek Dep. 42, P. Wnek Dep. 36).

Plaintiffs contend that they disputed Whiteley's criticism of their workmanship. Rovetto told Whiteley that he had not worked on the soffits (Rovetto Dep. 42). Several plaintiffs testified that Rovetto also told Whiteley that SBI foreman Dan Turner instructed them to install the soffits as they had, and any deficiency was the result of inadequate materials (Wilke Dep. 52, K. Wnek Dep. 43, P. Wnek Dep. 35). No plaintiff testified to specifically protesting, while in Whiteley's presence, his order to correct the work on their own time. After Whiteley left, plaintiffs complained about working on Saturday and agreed amongst themselves not to come in (Rovetto Dep. 52-53, Wilke Dep. 60, Schiera Dep. 59, K. Wnek Dep. 43, P. Wnek Dep. 38). They contacted Turner and informed him they would not work for free. Turner called Whiteley that same day to discuss the soffits (Whiteley Dep. 52, 61). Whiteley told Turner that the work was unsatisfactory and needed to be fixed (*Id.*). Turner alleges that he then spoke with plaintiffs about coming to work on Saturday to redo the soffits (Turner Dep. 84). Turner testified that Wilke, Schiera and both of the Wneks told him they could not come in for various reasons, while Rovetto said he did not want to come in because no one else was going to work that day.

On Saturday, September 6, 2003, only Muscia showed up at the Highlands to repair the soffits. Whiteley came by the work site and spoke with Muscia. Muscia told him that he was the only one who showed up to work. The following Monday, September 8, 2003, Whiteley contacted Susan Coleman, SBI's office manager, and requested each of the plaintiffs' up-to-date payroll checks. Whiteley delivered the checks to plaintiffs and informed them that they were terminated. However, he did not fire Muscia. After working that Saturday, Muscia was not paid for his hours in his subsequent paycheck (Coleman Dep. 73). He did not report the hours, nor did Turner or Whiteley record them on Muscia's time sheet (Coleman Dep. 69-76). A few weeks later, Turner asked SBI's officer manager, Susan Coleman, whether Muscia had

been paid for his work on September 6. When she discovered that he had not been paid, Coleman called Muscia to inquire. Muscia told her that he had not requested payment because he "came in to fix something that [he] screwed up" (Coleman Dep. 76). Coleman then issued Muscia a check for the hours that he worked.

Following their termination, plaintiffs contacted their union's business representative, Mark Maher. Maher spoke with Whiteley on September 17, 2003, and, according to Maher, Whiteley stated that he told plaintiffs that they had to fix the soffits and he was not going to pay them for it (Maher Dep. 40-41, 44, 48). In notes that Maher made immediately after his conversation with Whiteley, he wrote, "Bill admitted to telling the men that he would not pay them to fix the repair, but said he does not remember telling them they had to fix it on Sat." (Maher's Employer Contact Log). Maher testified that Whiteley also stated that he probably would not have fired plaintiffs had they fixed the work on Saturday (Maher Dep. 44). The union did not pursue a grievance on behalf of plaintiffs. Plaintiffs filed this action on October 2, 2003, arguing that their terminations served as retaliation for exercising their right to be compensated for their work.

As SBI neared completion of its subcontract on the Highlands project, it began to lay off carpenters working at the site. When plaintiffs were terminated, SBI employed fifty-three non-foremen carpenters, like plaintiffs (Coleman Affidavit). By December 13, 2003, SBI employed thirty such employees and by February 7, 2004, there were only six (*Id.*). On March 14, 2004, the five non-foremen, journeymen carpenters included two relatives of Salamone and two apprentices under SBI foremen (*Id.*).

## DISCUSSION

First we address plaintiffs' motion to strike portions of defendants' Local Rule 56.1 Statement of Material Facts. Plaintiffs seek to strike references in paragraphs 10, 11, 12, 13,

19, and 24 that relate to Anthony Hagar. Hagar was allegedly a superintendent for Lincoln Properties, overseeing the Highlands development project. In their statement of facts, defendants assert that Hagar contacted Whiteley to complain about the poor quality of workmanship on the soffits. Hagar's complaints spurred Whiteley to review the work himself and subsequently meet with plaintiffs and Muscia the next day. To support their statements concerning Hagar's complaints, defendants cite to Whiteley's deposition. Plaintiffs argue that these statements of fact should be stricken because they relate uncorroborated, self-serving hearsay. They contend that despite repeated requests, defendants have not provided them with current and correct contact information for Hagar. Thus, they have been unable to depose him. Plaintiffs further argue that Hagar's statements concerning the quality of workmanship on the soffits are hearsay.

In their response to the motion to strike, defendants assert that they have provided plaintiffs with all the contact information they have for Hagar. As Hagar is not a defendant and never worked for a defendant, it is understandable that they do not have his current address or phone number. Defendants are not under any obligation to conduct an investigation into his whereabouts for plaintiffs. Plaintiffs' failure to locate Hagar for a deposition does not necessitate that we strike any references to him. Defendants' relevant statements of fact rely not on Hagar's affidavit or deposition, but on Whiteley's, who was available for deposition. Nor must we strike these statements as hearsay. Hagar's statements to Whiteley concerning the quality of work on the soffits need not be offered to evidence the poor quality of the work, but rather to explain why Whiteley inspected plaintiffs' work. If offered for this purpose, the statements are not offered for the truth of the matter asserted and are therefore not hearsay.

We now turn to the motion for summary judgment. Our function in ruling on a motion

for summary judgment is to determine if there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the evidence on file shows that no such issue exists and the moving party is entitled to judgment as a matter of law we will grant the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir. 2002). A "metaphysical doubt as to the material facts" is not enough to create a genuine issue of fact for trial, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986); the evidence must allow for a reasonable trier of fact to find for the non-movant. Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing a motion for summary judgment we draw all inferences in the light most favorable to the non-movant. DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987).

In their first count, plaintiffs claim that defendants terminated them for exercising their rights under the FLSA, in violation of the Act's anti-retaliation provision, Section 15(a)(3). This section states that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Numerous circuit courts have construed this section broadly so as to provide a retaliation claim even though the plaintiff did not engage in one of the expressly named activities. See e.g., Valerio v. Putnam Associates Inc., 173 F.3d 35, 42 (1st Cir. 1999); Saffels v. Rice, 40 F.3d 1546, 1548 (8th Cir. 1994); EEOC v. Romeo Community Schools, 976 F.2d 985, 989-90 (6th Cir. 1992); EEOC v. White & Son Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989); Brock v. Richardson, 812 F.2d 121, 124 (3d Cir. 1987); Love v. Re/Max of America, Inc., 738 F.2d 383, 387 (10th Cir. 1984); but see Lambert v. Genesee Hospital, 10 F.3d

46, 55 (2d Cir. 1993). Though the Seventh Circuit has not directly addressed whether conduct other than that named in § 15(a)(3) can trigger a retaliation claim, it has encouraged a broad reading of this section. Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219 (7th Cir. 1995)(successful retaliation claim where plaintiff was fired after informing his employer's auditor that he had not been paid for his overtime); see Wittenberg v. Wheels, Inc., 963 F.Supp. 654, 658-59 (N.D.Ill. 1997). Courts have also relied on the Supreme Court's discussion of the FLSA's purpose to support their broad reading of the anti-retaliation provision. See Wittenberg, 963 F. Supp. at 658; Cuevas v. Monroe Street City Club, Inc., 752 F.Supp. 1405, 1413 (N.D.Ill. 1990). In Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292 (1960), the Supreme Court noted that Congress sought to ensure compliance with the FLSA through reliance on information and complaints provided by employees, and, thus, "effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances." As fear of retaliation may inhibit employees from filing a complaint pursuant to the FLSA, "courts have construed the meaning of the anti-retaliatory provision more broadly, so as to include less formal complaints by employees." Cuevas, 752 F.Supp. at 1413.

A plaintiff can establish a prima facie case for unlawful retaliation using either the direct method or indirect method. Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 644 (7th Cir. 2002). To prove retaliation under the direct method, a plaintiff must provide direct evidence that he engaged in a protected activity and as a result suffered an adverse employment action. Id. The defendant may defeat the plaintiff's case as a matter of law by providing unrebutted evidence that he would have taken the same action against plaintiff in the absence of a retaliatory motive. Id. To prove retaliation under the indirect method, the plaintiff relies on circumstantial evidence. He must show that after engaging in a protected activity, he and not any similarly situated employee who did not engage in the

activity, suffered an adverse employment action despite satisfactory job performance. *Id.* Again, the defendant may attempt to defeat the claim by presenting evidence of a non-invidious reason for the action, and the plaintiff may try to rebut this evidence by exposing it as a pretext. *Id.*

Defendants argue that plaintiffs cannot establish a claim for retaliation under the direct method nor the indirect method. They contend that plaintiffs did not engage in protected activity, and even if they did there is no causal connection with their termination because Whiteley was not aware of their protests. All parties agree that Whiteley ordered plaintiffs to perform work on their "own time." However, they disagree as to the meaning of this phrase and other statements he made. Defendants assert that Whiteley's statement may be interpreted simply as an order to perform mandatory overtime on Saturday. However, plaintiffs' testimony that Whiteley said he would not pay them twice for the soffit work, and Maher's testimony that Whiteley admitted he intended the plaintiffs to work for free, contradicts this interpretation. This creates a question of fact as to Whiteley's order. Defendants argue that we need not resolve this issue in order to grant summary judgment in their favor because plaintiffs did not protest working for free to Whiteley, nor did he learn of their protests before firing them.

If there were evidence that plaintiffs had complained to Whiteley about his alleged expectation that they work for free, or that Whiteley had learned of their oral complaints, we would have to reject defendants' summary judgment motion and allow a trier of fact to resolve the conflicting evidence. However, plaintiffs have not produced evidence that they voiced their complaints to Whiteley about his alleged expectation that they work for free. The record contains testimony that plaintiffs protested Whiteley's criticism of their work on the soffits, but the record does not evidence that they complained to Whiteley about his denial of their

right to be paid for their work. The record indicates that plaintiffs did complain to Turner and Muscia about working for free, but there is no evidence (only conjecture) that these complaints were passed on to Whiteley. Nonetheless, plaintiffs argue that they protested Whiteley's FLSA violation by refusing to comply with his order to come in on Saturday and work on their own time. Whiteley was aware that plaintiffs did not work on the soffits on Saturday and, on Monday, he fired them. Thus, the central question is whether an employee's refusal to perform work for which he has been told he will not be paid, qualifies as protected activity under the FLSA.

As discussed above, the majority of circuits have held that protected activities under the FLSA's anti-retaliation provision are not strictly limited to the listed activities. Most commonly, courts have held that this protection applies to informal oral or written complaints made within a company. *See, e.g.*, Valerio, 173 F.3d at 41; Love, 738 F.2d at 387. However, the anti-retaliation provision has also been found to protect employees who have refused to release or return back pay awards to their employers, *see* Marshall v. Parking Co. of America, 670 F.2d 141 (10th Cir. 1982); Brennan v. Maxey's Yamaha, Inc., 513 F.2d 179, 180-83 (8th Cir. 1975); Wirtz v. Ross Packaging Co., 367 F.2d 549 (5th Cir. 1966), employees who have informed individuals other then their employers or the Department of Labor of FLSA violations, Avitia, 49 F.3d at 1219, and even employees who have not engaged in a protected action but whom employers mistakenly believed had engaged in such activity and had then suffered an adverse employment action, Brock, 812 F.2d at 125. In applying the anti-retaliation provision in these cases, the courts determined that the employee's activities were "necessary to the effective assertion of employees' rights under the Fair Labor Standards Act, and thus entitled to protection." *Id.* at 124; Love, 738 F.2d at 387 ("When the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is

discriminatory under § 215(a)(3) whether or not other grounds for discharge exist." (*Internal quotations omitted*)).

The refusal to work for free is akin to the refusal to release the right to back pay for overtime. In both cases, an employee asserts his right to be paid for his work, as is required under the FLSA. Just as terminating an employee for refusing to release the right to back pay is a retaliatory discharge, so is terminating an employee who refuses to work for free. If an employee has been told that he will not be paid, but nonetheless will be fired if he does not work, he need not work the hours, await his next deficient paycheck, and then complain, in order to have a retaliation claim in the event the employer makes good on the threat.

There is evidence to support plaintiffs' claim that Whiteley demanded that they work for free. Plaintiffs contend that their absence on Saturday was a refusal to forfeit their right to payment for their work, and that a factual question then arises as to whether defendants fired them for this protest. Without doubt, this issue would be clearer if plaintiffs had made oral protests to Whiteley before failing to show up at the job site on Saturday. Plaintiffs' complaints to Muscia and Turner, and their conversations amongst themselves, evidence that their refusal to work Saturday was in protest to an order to work for free. Thus, plaintiffs have provided sufficient evidence that they engaged in a protected activity to survive summary judgment.

Defendants also argue that they are entitled to summary judgment on plaintiffs' FLSA claim due to lack of causation between plaintiffs' engagement in a protected activity and their terminations. While the Seventh Circuit has held that suspicious timing alone is rarely enough to establish causation between a protected activity and an adverse employment action, *see* Stone, 281 F.3d at 644, suspicious timing is "an important evidentiary ally of the plaintiff." *See* Lalvani v. Cook County, Ill., 269 F.3d 785, 790 (7th Cir. 2001)("When an adverse

employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied."); Culver v. Gorman & Co., — F.3d —, 2005 WL 1683965 at *4 (7th Cir. 2005). Whiteley's termination of plaintiffs occurred on the first business day after he learned that they had not worked "on their own time." This temporal proximity certainly supports a claim for causation. However, plaintiffs do not rely solely on the immediacy of their terminations to evidence the relevant causal connection. In their depositions, plaintiffs testified that Whiteley stated that they had to fix the soffits on their own time or they would be terminated. According to Maher's testimony, Whiteley admitted that he probably would not have fired plaintiffs had they repaired the soffits on their own time. Furthermore, Muscia, who did work on Saturday and did not complain when he was not paid for the work, was not fired. In light of this evidence, defendants' counter-evidence that plaintiffs were fired for a lawful reason, such as poor workmanship on the initial soffits, "just creates an issue of fact: what was the true cause of the discharge?" See Stone, 281 F.3d at 643.

Defendants also seek summary judgment on plaintiffs' Illinois common law claim for retaliatory discharge. They argue that the limited scope of retaliatory discharge under the Illinois common law does not encompass retaliation against employees who make individual wage claims. In Illinois, a non-contractual employee serves at the employer's will and may be fired for any reason or no reason at all. Zimmerman v. Buchheit of Sparta, Inc., 164 Ill.2d 29, 32, 645 N.E.2d 877, 879 (Ill. 1994). To uphold and further public policy, the Illinois Supreme Court created a narrow exception to this rule by recognizing a common law claim for retaliatory discharge. Kelsay v. Motorola, Inc., 74 Ill.2d 172, 181, 384 N.E.2d 353, 357 (Ill. 1978). A claim for retaliatory discharge under Illinois common law "requires a showing that an employee has been (1) discharged; (2) in retaliation for the employee's activities; and (3)

that the discharge violates a clear mandate of public policy." <u>Hartlein v. Illinois Power Co.</u>, 151 Ill.2d 142, 160, 601 N.E.2d 720, 728 (Ill. 1992). Plaintiffs argue that their termination violated the clear mandate of the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/1 *et seq.* They cite <u>Robbins v. City of Madison</u>, 193 Ill.App.3d 379, 384, 549 N.E.2d 947, 949 (5[th] Dist. 1990), in support of their claim. In that case, an Illinois appellate court stated that the discharge of an employee who refuses to work for less than the minimum wage mandated by the IMWL would violate public policy. *Id.* However, the court went on to affirm the dismissal with prejudice of the plaintiff's claims. 193 Ill.App.3d at 385, 549 N.E.2d at 951.

Despite the dicta in <u>Robbins</u>, Illinois courts have repeatedly limited the reach of the retaliatory discharge claim. *See* <u>Fisher v. Lexington Health Care, Inc</u>, 188 Ill.2d 455, 468, 722 N.E.2d 1115, 1121 (Ill. 1999)("[W]e note that this court has consistently sought to restrict the common law tort of retaliatory discharge."). The Illinois Supreme Court has only recognized two situations in which it applies: when an employee is discharged for asserting a worker's compensation claim and when he is discharged for "whistle-blowing." <u>Kelsay</u>, 74 Ill.2d 172, 384 N.E.2d 353 (Ill. 1978); <u>Palmateer v. International Harvester Co.</u>, 85 Ill.2d 124, 421 N.E.2d 876 (Ill. 1981); <u>Jacobson v. Knepper & Moga, P.C.</u>, 185 Ill.2d 372, 376, 706 N.E.2d 491, 493 (Ill. 1998)(stating that "[w]hile there is no precise definition of what constitutes clearly mandated public policy, a review of Illinois case law reveals that retaliatory discharge actions are allowed in two settings," discharge in retaliation for a Worker's Compensation claim and for "whistle blowing). *See* <u>Geary v. Telular Corp.</u>, 341 Ill.App.3d 694, 701, 793 N.E.2d 128, 134 (1[st] Dist. 2003). Illinois appellate courts have recognized the state supreme court's reluctance to expand this tort claim and have consistently refused to apply it beyond these two circumstances. *Id.* (collecting cases); <u>McGrath v. CCC Information Services, Inc.</u>, 314 Ill.App.3d 431, 438, 731 N.E.2d 384, 389-90 (1[st] Dist. 2000)(collecting cases).

In McGrath, the plaintiff claimed that his termination for exercising his rights under the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1 *et seq.*, constituted a retaliatory discharge. The court rejected the notion that a retaliatory discharge claim could be based on the policy in this statute. Much like the Illinois Minimum Wage Act, the IWPCA is concerned with employees receiving proper compensation for their work. Its purpose is to "ensure that employees receive all earned benefits upon leaving their employer." 820 ILCS 115/1 *et seq.*; Mueller Co. v. Department of Labor, 187 Ill.App.3d 519, 524, 543 N.E.2d 518, 521 (4th Dist. 1989). As with the IMWA, the IWPCA makes it a misdemeanor to knowingly discharge an employee because he has brought a complaint pursuant to the statute's provisions. 820 ILCS 115/114(c); 820 ILCS 105/11(c). Nonetheless, the court found that the IWPCA did not provide a clearly mandated public policy upon which employees could base a common law retaliatory discharge claim. McGrath, 314 Ill.App.3d at 440, 731 N.E.2d at 391. The court noted that, in general, public policies associated with economic regulation "are less likely to be held sufficient to support claims of retaliatory discharge." *Id.* (citing Leweling v. Schnadig Corp., 276 Ill.App.3d 890, 894, 657 N.E.2d 1107, 1109-10 (1st Dist. 1995); Fowler v. Great American Insurance Cos., 653 F.Supp. 692, 697 (N.D.Ill. 1987)). In light of current precedent in the Illinois courts, and the Illinois Supreme Court's focus on curtailing the expansion of the retaliatory discharge claim, we conclude that plaintiffs cannot state a claim for common law retaliatory discharge pursuant to the IMWL. Defendants' summary judgment motion as to this claim is granted.

Next, defendants seek summary judgment as to defendant Joseph Salamone. They argue that even though Salamone is the president and owner of Salamone Builders he was not involved in the termination of plaintiffs and therefore cannot be held liable in his individual capacity for plaintiffs' alleged retaliatory discharges. Plaintiffs contend that whether or not

Salamone played a role in ordering them to work for free or in deciding to terminate them is "irrelevant." Citing Reich v. Harmelech, 1996 WL 308272 at *1 (N.D.Ill. 1996), they argue that since Salamone is involved in the operations of the company and setting policy, he is liable.

In Reich, the Secretary of Labor brought an action against two defendants for paying employees less than minimum wage. *Id.* The defendants contended that they were not "employers" under the definition of the FLSA and therefore could not be held liable. *Id.* at *4. Though the degree to which defendants were involved in the day-to-day operations of the business was in dispute, the court found that they were employers based on a number of undisputed facts. For one of the defendants, these included that he signed the employee payroll checks that were paying less than minimum wage, that he had knowledge and authority to act on employees' complaints about payroll issues, and that he represented the company before the Wage and Hour authorities concerning employees' salary complaints. *Id.* These are all factors that evidence the defendant's knowledge and involvement in the alleged violation – failure to pay sufficient wages. The court explained that whether an individual could be held liable under the FLSA did not depend on whether they controlled every aspect of the employee's conduct, "but whether the individual had control over the alleged violation of the FLSA." *Id.* at *3 (citing Riordan v. Kempiners, 831 F.2d 690, 694 (7th Cir. 1987); Freeman v. Foley, 911 F.Supp.326, 331 (N.D.Ill. 1995)("even if a defendant does not exercise exclusive control over all the day-to-day affairs of the employer, so long as he or she possess control over the aspect of employment alleged to have been violated, the FLSA will apply to that individual")).

There is no evidence that Salamone had control over plaintiffs' retaliatory discharge – the alleged FLSA violation in the instant case. The uncontested facts reveal that Salamone Builder's superintendents have the authority to hire and/or fire the carpenters at their work

sites. Only Whiteley is alleged to have ordered plaintiffs to work on their own time, and there is no evidence that anyone other than Whiteley made the decision to terminate them. Salamone's weekly visit to the Highlands site, and his numerous daily conversations with his office manager, do not create a question of fact regarding his involvement in this alleged violation. As SBI's office manager stamped Salamone's signature on plaintiffs' final paychecks (Coleman Dep. 56-57), that signature also fails to evidence Salamone's involvement in their terminations. Summary judgment is granted as to Joseph Salamone.

Defendants' final request in their summary judgment motion requires little discussion. They argue that in the event of a damages award for plaintiffs, their back pay should be limited as a matter of law to that which they would have received up until March 14, 2004. They contend that plaintiffs would have been laid off on that date, if not sooner. Defendants' rest their argument on the diminishing number of non-foremen, journeymen carpenters, that were employed in the months after plaintiffs' terminations. By March 14, 2004, there were only five of these carpenters working for SBI, of which four were either relatives or close friends of SBI management. Defendants' highlight that SBI laid off Muscia, Salamone's cousin, on February 7, 2004.

Nonetheless, drawing all inferences in favor of the non-movant plaintiffs, we cannot find for defendants. Plaintiffs had all worked for SBI for over a year. Wilke, who had worked at SBI for five years, was considered a "core guy." Schiera had worked there for seven to eight years. There remains a question of fact as to whether any of the plaintiffs may have been included among the non-foremen carpenters employed by SBI after March 14, 2004. Furthermore, not all layoffs at SBI appear to be permanent, as Muscia had been hired back after his February 7, 2004, layoff.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to strike is denied and defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted for defendants as to the Illinois common law retaliatory discharge claim, but is denied as to the FLSA retaliation claim. Summary judgment is also granted for defendant Joseph Salamone as to all claims. Finally, defendants' motion for summary judgment as to damages is denied.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　_James B. Moran_
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　JAMES B. MORAN
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Senior Judge, U. S. District Court

_Sept. 19_, 2005.